### DONOHOE et al. v. TJOSEVIG et al.

(First Division. Juneau. March 6, 1919.)

No. 853, Valdez.

I. Attorney and Client ⬧78—Deeds ⬧6—Contracts—Construction.

Plaintiffs, attorneys at law, at Valdez, Alaska, on January 12, 1911, entered into a written agreement with defendants to act for them in pending litigation in consideration for 7½ per cent. interest in certain mining claims then the subject of litigation. In the contract the defendants agreed to deed to plaintiffs their agreed interest as soon as the case was decided,

⬧See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

"and in case the said parties of the first part are unable to or refuse to execute said deed as above, then and in that case this instrument shall be understood to be, and it is hereby agreed to be, a conveyance, and the said parties of the first part hereby give and grant unto the said parties of the second part, their heirs, executors, administrators, and assigns, the said undivided seven and one-half one-hundredths interest in and to the said above-described lode mining claims." Defendants failed and refused to perform, and on suit by plaintiffs, *held*, the agreement is a contract for attorney's fees, a contract for a deed, but not a deed itself.

2. **Attorney and Client** ⊚⇒148(2)—**Mines and Minerals** ⊚⇒23(6)—**Trusts.**

Defendants employed attorneys to protect their title to certain mining claims, agreeing to deed them 7½ per cent. of the claims or the proceeds left after judgment, and to do the necessary annual assessment work on the mining claims for them. Thereafter, in violation of their agreement, defendants sought to forfeit the interests of their attorneys by advertising them out for failure to do their proportion of annual assessment work. *Held*, defendants became trustees for the interests of their attorneys, that the assessment work so performed by defendants served to protect the trust interest, and the forfeiture proceedings were void.

3. **Mines and Minerals** ⊚⇒25—**Forfeitures—Evidence—Statutes—Construction.**

A statute declaring a forfeiture of property interest should be strictly construed, and the burden of proof is on the party claiming the forfeiture.

4. **Mines and Minerals** ⊚⇒23(6)—**Annual Assessment Work—Notice of Forfeiture.**

A notice by two co-owners of the forfeiture of several mining claims for the alleged failure of other co-owners to do their part of the annual assessment work thereon in compliance with United States statutes, which notice included other mining claims in which the alleged defaulting co-owners had no interest or claim, and which notice declared the aggregate sum so alleged to be due upon all the claims, and not separately, is void. The amount of work done and the sum due on each claim should have been stated. The omission so to state, and the omission to state any facts which might excuse that nonstatement, is fatal.

5. **Mines and Minerals** ⊚⇒23(6)—**Notice of Forfeiture.**

A notice for the forfeiture of mining claims for failure of a co-owner to do his share of the annual assessment work on such claims must be given in the newspaper published nearest

⊚⇒See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the claims, and failure to make proof of such publication is fatal to the validity of such notice.

**6. Trusts ⬳17, 18(3), 101—Trust Arises from Contract to Convey Property in Consideration of Services, Not Within Statute of Frauds.**

Where, on performance by complainants of services under a written contract with defendants, complainants became entitled to conveyance of an interest in mining claims, legal title to which was in defendants, from that time defendants held complainants' interest in trust, and such trust relation cannot be attributed to a subsequent oral agreement to defer the conveyance, so as to bring it within the statute of frauds.

**7. Deeds ⬳6—Agreement to Convey Property Not Converted into Conveyance.**

A contract providing that, on performance by complainants, defendants should convey to them an interest in certain property, *held* not converted from an agreement to convey into a conveyance by a further provision that, if defendants should be unable or refuse to convey, it should be treated as a conveyance.

**8. Mines and Minerals ⬳54(2)—Construction of Quitclaim as to Property Conveyed.**

Where the grantors in a quitclaim deed to mining property represented that they were the sole owners, and they in fact held the legal title of record, which they purported to convey, they cannot claim, as against the owner of an equitable title, who affirms the sale, that their deed did not convey such interest.

The original complaint in this case was filed September 5, 1916, and it alleged that plaintiffs and defendants Tjosevig and Halverson entered into a contract as follows:

### "Contract.

"This contract and agreement, made and entered into this 12th day of January, 1911, by and between Christian Tjosevig and Eli Tjosevig, husband and wife, and Andrew Halverson, all of Valdez, Alaska, the parties of the first part, and Edmund Smith and T. J. Donohoe, of the same place, the parties of the second part, witnesseth:

"That whereas, the parties of the first part are the same parties named as defendants in that certain cause now pending in the district court for the territory of Alaska, Third division, wherein Nils Tjosevig is plaintiff, which said cause is No. 403, and that said second parties are attorneys at law, engaged in the practice of the same at Valdez, Alaska, and that said cause of action is in refer-

---

ence to certain mining claims situated in the territory of Alaska, and described as follows, to wit: The Tjosevig Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, lode mining claims, the Nebraska, Norway, Charlotte, June No. 2, and Teddy Lode lode mining claims, all of said lode mining claims being in one contiguous group situated on Glacier creek, Hidden creek, and Trail creek, tributaries of the Kennicott river, Valdez mining district, territory of Alaska; also those certain six (6) lode mining claims heretofore described and originally located as Tjosevig No. 3, Nebraska, Tjosevig No. 14, Tjosevig No. 12, Teddy Lode, and Charlotte, but which said six (6) claims were afterwards relocated and recorded by said first parties and named as follows, to wit: Dagny Marie, Copper Glance, Sadie, Edna, Paula, and New York. The location certificates of all of said above-described mining claims being of record in the office of the recorder at Valdez, Alaska, to which records reference is hereby made for a further description of said mining property. That all or part of said mining claims are involved in said clause of action No. 403:

"Now, therefore, in consideration of the said parties of the second part looking after said case and counseling and advising and assisting in the same in the said district court, or if same is submitted to arbitration and award, the said parties of the first part will, as full compensation for such services by said parties of the second part, deed to the said parties of the second part an undivided seven and one-half one-hundredths (7½/100) interest in and to each and all of said above-described mining claims and mining property. The said interest so conveyed to be deeded from whatever remaining interest said first parties may have in all of said mining claims after the said case has been decided, either by the court, or by arbitration and award, or by agreement of the parties, and said interest deeded shall be seven and one-half one-hundredths of the total interest so remaining to said first parties, whether each of said claims are involved in said litigation or not.

"The said seven and one-half one-hundredths undivided interest in and to each of said claims shall be conveyed immediately after the settlement of the said litigation as aforesaid, by a good and sufficient quitclaim or mining deed, and in case the said parties of the first part are unable to or refuse to execute said deed as above, then and in that case this instrument shall be understood to be, and it is hereby agreed to be a conveyance, and the said parties of the first part hereby give and grant unto the said parties of the second part, their heirs, executors, administrators, and assigns, the said undivided seven and one-half one-hundredths (7½/100) interest in and to the said above described lode mining claims.

"To have and to hold the same unto the said parties of the second part, their heirs, executors, administrators, and assigns, forever.

"In consideration of the above agreements the said parties of the second part hereby agree to and with the said parties of the first part, to give their time and attention to said cause, and to the best of their ability to aid, counsel, and assist said parties of the

first part and to protect their interests, whether said cause is. tried in said district court, or by arbitration and award, or settled by the parties interested.

"In witness whereof, the said parties hereto have hereunto set their hands and seals this 12th day of January, 1911.

| | |
|---|---|
| "Christian Tjosevig. | [Seal.] |
| "Eli Tjosevig. | [Seal.] |
| "Andrew Halverson. | .[Seal.] |
| "Edmund Smith. | [Seal.] |
| "T. J. Donohoe. | [Seal.] |

"In presence of
    "F. E. Weber.
    "Chas. E. Bunnell."

—duly acknowledged, and that plaintiffs performed said contract on their part, their efforts resulting in a decree wherein interests were declared to be as follows:

| Ownership. | | Claims. |
|---|---|---|
| In Nils Tjosevig..........21½/48 | | Tjosevig Nos. 1 to 15, Inc. |
| In Christian Tjosevig......21½/48 | | Nebraska. |
| In Gus Dgarf ............ 1/48 | of | Norway. |
| | | Charlotte. |
| In Charles Garwood ...... 1/48 | | Teddy. |
| In Eli Tjosevig .......................... | | All of Dagny Marie. |
| In Eli Tjosevig.......................... | | All of Carbonite Hill. |
| In Eli Tjosevig .......................... | | All of New York. |
| In Andrew Halverson .................... | | Nothing. |

But that said defendants ignored the rights of plaintiffs, sold the claims for a large amount of money and stock, under some kind of arrangement with the defendants' banks (the exact terms of which are unknown to plaintiffs), under which some of the said money has been paid, and the remainder of the money and all of the stock is put in escrow. They pray that they may be adjudged owners of their said percentage, for an injunction on said banks, for an inspection, for an accounting, etc.

On the filing of the complaint the court (Judge Brown) issued a temporary injunction as prayed for, but refused to order inspection until such time as defendants Tjosevig and Halverson "have had opportunity to appear in court and set forth their defense."

On March 13, 1917, defendants Tjosevig and Halverson filed their joint answer, in which they admitted the contract, the performance by plaintiffs of their part, and the rendition

of the decree as alleged. The answer also admitted the sale by said defendants for $117,000 in cash and 125,000 shares of stock, but alleged that said sale was a quitclaim of their interests "only, and no more," in some of the claims mentioned in the decree and of certain claims not so mentioned. Said answer also admitted that at the time of filing the same the said $117,000 had been paid to the bank, admitted that the bank was said defendants' agent and trustee, admitted the refusal to account, and affirmatively alleged that whatever interest plaintiffs ever had had become forfeited to the Tjosevigs for noncontribution by the former of their proportion of the assessment work, under and by virtue of regular proceedings (setting them forth in full) taken by said Tjosevigs in compliance with section 2324, U. S. R. S. (U. S. Comp. St. § 4620).

On same day defendants filed a joint motion, supported by the affidavit of Tjosevig, to the effect that plaintiffs' claim could not possibly amount to more than $12,000, and said motion prayed the court to order released to defendants all cash in excess of said $12,000. On hearing said motion, the court ordered all in excess of $17,000 to be released.

To this joint answer a reply was filed October 19, 1917. Said reply denied that the said deed was only a quitclaim of said defendants' right, title, and interest, and alleged that whatever other claims said deed embraced, if any, were mere convenience locations of no value, and did not add to the consideration paid, and as to forfeiture on account of nonpayment of assessment work, alleged affirmatively the existence of a parol contract by which said defendants were to do the assessment work for plaintiffs in consideration of plaintiffs "looking after the legal end" and endeavoring to effect a sale, etc., and that plaintiffs performed their part of the alleged contract, and also denied that they were "legally advertised out"; and said reply also sets up an estoppel.

On February 7, 1918, plaintiffs, having obtained leave, filed their amended and supplemental complaint, adding to their original complaint substantially the following allegations, to wit: That the price to be received by the said defendants for said claims was $121,000 in cash and 125,000 shares of stock, and that the cash has been paid to the bank as agent and trustee of said Tjosevigs and Halverson. It also alleged that the stock was once worth par, and plaintiffs could have sold it for

that sum, had the defendants delivered to them their share, as they ought to have done, but that since then it has depreciated, so that it is now of no value at all, and that by said wrongful action of defendants in withholding their share of stock from them they have been damaged in the sum of $9,375, the par value of their share of the stock. The prayer is for judgment and for injunction.

To this amended and supplemental complaint the defendants Tjosevigs filed, on February 20, 1918, their joint answer, substantially as follows, to wit: In addition to the defenses of forfeiture by plaintiffs, and of quitclaim of their (defendants') rights only, as set up in the answer to the original complaint, they deny receipt of the stock in question and deny any damages. They also allege that the money was received in consideration of the conveyance of claims and interests in addition to those mentioned in the contract, to which said additional claims and interests the said Donohoe and Smith had no possible right or title, and that these additional claims and interests were of great value, and "there is no way of determining or ascertaining, if the court shall find that the plaintiffs are entitled to any part of the money received by the defendants, what their proportion or share shall be." There is also the allegation that $3/48$ of the sum received is the sole property of Andrew Halverson, and that for that interest so belonging to him exclusively he was to have $20,000, and that the $17,000 now remaining in the hands of the bank is his property. There is also a defense of estoppel on Donohoe and Smith to claim any interest.

To this plaintiffs filed a reply on same day (February 20, 1918), setting up the parol contract and performance on their part, as to the performance of assessment work; defects in the forfeiture proceeding; denial of the allegation that the deed given by the Tjosevigs was a quitclaim of only their right, title, and interest, as set up in the original complaint; admitting that the stock has not been received; alleging affirmatively that the nonreceipt was Tjosevig's fault; denying that the $3/48$ interest or the $17,000 now on hand belonged or belongs to Halverson; alleging that said interest belonged to Tjosevig and is covered by the contract; setting up estoppel on Halverson to claim that interest.

6 A.R.—10

The separate answer of Halverson to the amended complaint sets up ownership in himself as to that $3/48$ and in general follows the line of Tjosevig's answer to same complaint in so far as the latter relates to said $3/48$.

The reply to this answer of Halverson follows in general the lines of the reply to Tjosevig's answer, so far as that answer relates to the $3/48$.

On the pleadings formed the parties went to trial.

Donohoe & Dimond, of Valdez, and Hellenthal & Hellenthal, of Juneau, for plaintiffs.

Martin J. Lund, of Seattle, Wash., and John Rustgard, of Juneau, for defendants.

JENNINGS, District Judge. The case largely revolves around the issue arising out of the allegation by defendants of the failure of plaintiffs to contribute their proportion of the cost of the assessment work for the years 1913–14 and the alleged "forfeiture" of plaintiffs' interests.

Defendants contend that the "contract" for attorney's compensation is a deed, and made Donohoe and Smith co-owners of the legal title, insomuch as it uses this language:

"And said parties of the first part hereby give and grant unto said parties of the second part, their heirs, executors, and assigns, the said undivided seven and one-half one-hundredths interest in and to the said above-described mining claims. To have and to hold the same unto the said parties of the second part, their heirs, executors, administrators, and assigns, forever."

I cannot agree with defendants' contention. A casual reading of the instrument shows that it is a contract for attorney's services. The client agrees that in consideration of said services "he *will* deed to said attorneys," etc. Said interest is *to be deeded* out of certain property, and it is to be conveyed "*immediately after the settlement of said litigation.*" Then follows the provision that, *in case the parties of the first part* "are unable to or refuse to execute the deed" which they agreed to execute, the contract shall have the effect of a deed. In the absence of such inability or refusal the instrument does not have the effect of a deed; it is simply a contract for a deed, the legal title still being in parties of the first part in trust, as to $7\frac{1}{2}$ per cent. interest, for parties of the second part.

No inability or refusal to deliver a deed is alleged or was

shown; but, on the contrary, Donohoe explains why no deed was demanded, and also why the contract was not put upon record.

Did the plaintiffs have with the defendants an oral agreement by which the plaintiffs' assessment work was to be performed by the defendants in consideration of the plaintiffs "looking after the legal end," etc., as set forth in the pleadings?

Smith and Donohoe swore positively that this was the arrangement; Tjosevig just as firmly denied it. There is in evidence a letter from Tjosevig to Donohoe's partner, of date December 19, 1914, when Tjosevig was about to begin the process of "advertising out," wherein he says:

"P. S.—Tell T. J. Donohoe that, if he sees his name in a bunch that I am going to advertise out after the first of the year, not to get alarmed, but say nothing about that, as parties may not get wise; this will be in the Chitna Leader, of course; that would straighten things up a little better for me." (Plaintiffs' Exhibit L.)

The admonition for Donohoe "not to get alarmed" was taken by the latter to mean this, "Donohoe must not think that I am going back on our arrangement," and he testified that he "acted on that letter and disregarded the advertisement." Tjosevig testified that he meant by those words that he would settle with Donohoe satisfactorily. Whatever was his meaning and intention, it cannot be gainsaid that the language used was well calculated to lull Donohoe into a sense of security. Certainly in the face of such circumstances it is hardly consonant, with that entire good faith with which the trustee is bound to treat his cestui que trust, for that trustee to attempt to reap advantage from a state of mind which he had inspired.

The claims were situated many miles from Valdez. Donohoe and Smith's interest was a very small one. Tjosevig was in possession of the claims, and he never made any demand whatsoever upon either Donohoe or Smith for their proportion of the assessment work, and the relations between them had not then become strained.

The demeanor on the stand—the manner of testifying—of Tjosevig, his evasions, his exaggerations, his violent temper, his quarrels with his brother, and his manifest "juggling," to the end that Halverson, his brother-in-law, who seems not to be over bright, might be made to bear the loss and he himself

emerge unscathed (see heading "Halverson's Interest," further on in this opinion) do not commend him very highly.

The question as to the existence of this agreement for the performance of the assessment work was submitted to a jury regularly impaneled and sworn, and they, after hearing the evidence on that point, answered the question in the affirmative, and from a consideration of the said evidence the court also reaches the conclusion reached by the jury.

Donohoe and Smith performed their part of this agreement, and, that being so, there was not anything due to Tjosevig for or on account of the assessment work.

I think, too, that the Tjosevigs, being trustees for Donohoe and Smith, could not legally forfeit to themselves the interest of their cestuis que trustent. They were bound to the exercise of the utmost good faith, and the burden was on them to show such good faith. They have not sustained that burden.

Laying aside, however, for the moment the question as to whether or not a trustee can, under section 2324, R. S. U. S., forfeit the interests of his cestui que, and conceding for the moment that no such agreement about assessment work as Donohoe and Smith testified to existed, the court is of opinion that the proceedings looking to the forfeiture are fatally defective, and that Donohoe and Smith's interest was not legally forfeited, although they (Tjosevigs) assumed to have forfeited it, and got money from Rowe and the other defendants on the assumption that it had been forfeited.

"This statute [section 2324, U. S. R. S.] is one of forfeiture and should be strictly construed." 2 Lindley on Mines (3d Ed.) § 646, p. 1622.

"And the burden is upon the party claiming the forfeiture." Id. p. 1628.

(a) There are many claims involved in the notice published, and some of these claims are said to comprise the Tjosevig group (belonging to Christian Tjosevig); but the others seem to be detached claims (belonging to Eli Tjosevig), and yet in the notice there is one aggregate sum of $150 said to be due for that amount of work done on all said claims. The amount of work done and the sum due on each claim should have been stated. The omission to so state, and the omission to state any facts which might excuse that nonstatement, is fatal. Haynes v. Briscoe, 29 Colo. 137, 67 Pac. 156.

(b) It does not appear that Christian Tjosevig was a co-owner of Dagny Marie or Carbonite Hill, or that Eli Tjosevig was a co-owner in the Tjosevig group, nor does it appear that the *amount required by law* has been performed by any one; yet both sign the notice, and state that Donohoe and Smith's interest "shall become the property *of his co-owners who have made the required expenditures.*" This is bad. Pack v. Thompson, 223 Fed. 635, 139 C. C. A. 181.

(c) There is no evidence in this case that the Chitna Leader, in which the notice of forfeiture was published, is the newspaper published nearest the claim. This is fatal. 2 Lindley on Mines, § 646, p. 1627; Haynes v. Briscoe, supra.

### Quitclaim.

The parties of the first part in the contract executed a deed to Tjosevig-Kennecott Copper Company, in which the following words are used, to wit:

"Do remise, release, and forever quitclaim * * * all of the right, title, and interest of the said parties of the first part in and to the following described mining property, to wit: * * * Together with all the dips, spurs, and angles, and also all the metals, ores, gold and silver quartz rock, copper and mineral earth therein, and all the rights, privileges, and franchises thereto appendant and appurtenant, or therewith usually had and enjoyed, and also all and singular the tenements, hereditaments, and appurtenances thereunto belonging or in any wise appertaining, and the rents, issues, and profits thereof, and also all the estate, right, title, interest, property, possession, claim, and demand whatsoever, as well in law as in equity, of the said parties of the first part of, in or to the said premises, and every part and parcel thereof, with the appurtenances. To have and to hold all and singular the said premises, together with the appurtenances and privileges thereunto incident, unto the said second party, its successors and assigns, forever."

The claims mentioned in the instrument just quoted from are the following: Tjosevig Nos. 1 to 15, inclusive, Nebraska, Norway, Charlotte, Dagny Marie, Contact Lode, Carbonite Hill, and Consolidated placer claim. (Norway and Norway 2 are names of one claim—Tjosevig's testimony.)

It is claimed that this is only a quitclaim deed of Tjosevig's right, title, and interest, and is not a disposal of Donohoe and Smith's interest.

Christian Tjosevig, his brother, Nils Tjosevig, his wife, Eli Tjosevig, and Andrew Halverson, his wife's brother, were in

possession of these claims and were the *record* owners of the entire interests, although as to 7½ per cent. of the Tjosevigs' interest they held the legal title as trustees for Donohoe and Smith, who had not put on record their contract for a deed, being deterred from so doing by representations of Tjosevig, their trustee. (Testimony of Smith and Donohoe.)

Christian Tjosevig seems to have been the authorized spokesman and negotiator for his brother, his wife, and his wife's brother. He negotiated a sale of the property to a Mr. Rowe on April 6, 1916. The option agreement, in which these negotiations merged, was made after the purported forfeiture, and contemplates, by its terms, the formation by Rowe of a corporation to take over and work these claims. The option agreement also stipulated "as a further consideration" for the "*above mining claims*" that certain moneys and stock are to be paid into bank to the credit of Christian Tjosevig, and certain other moneys to Nils Tjosevig, and Rowe and his assignees are given the right "to enter upon the said mining claims at any time after the execution of this instrument for the purpose of developing and equipping the said property, and operating the same as a going mine or mines, and to sell or dispose of any ore so mined or milled." And the agreement further provides that Rowe, or his assignees, is to guarantee the performance of the annual assessment work, and that in default thereof the agreement is at an end, and "the claims above referred to shall revert to the parties of the first part"—i. e., the Tjosevigs and Halverson.

At the time of giving the option to Rowe, Christian Tjosevig and wife evidently considered that they had been successful in forfeiting, and that they were the owners of all interests except what Nils Tjosevig owned. They so represented to Rowe, and Rowe says he "checked up the publication in the Chitna Leader." In answer to the question, "During all your negotiations and conversations with Christian Tjosevig, what interest in said mining claims did he propose or offer to convey?" Rowe says, "All of it." Rowe was a promoter, and it is hardly to be thought that he would be buying fractional interests in a mining enterprise which he was to lay before a corporation to be formed.

The option taken by Rowe was signed by Nils Tjosevig, and by defendants herein, and covers $^{48}/_{48}$, and it therefore reads

"all our right, title, and interest (*which said interest includes the whole*)." (Plaintiffs' Exhibit C to Rowe's deposition.) The option culminated in the agreement of January 6, 1916 (Plaintiffs' Exhibit D), and, Nils Tjosevig's interest (probably because he has "an agreement similar in most respects to this" —see said agreement) not being involved, this agreement provides for a deed of "all the right, title, and interest" of parties of the first part, to wit, Christian Tjosevig, Eli Tjosevig, and Andrew Halverson. Rowe testified that, when it came to making a deed to the corporation, he demanded a warranty deed, but Mr. Medley (the attorney) advised that, as Tjosevig only held these claims by compliance with the mining laws of the United States, he could only give a quitclaim (Rowe's deposition), and so the deed, itself, which is signed only by the defendants in this suit, uses the language "remise, release, and quitclaim all our right, title, and interest"—evidently meaning thereby *our* right (not Nils' right—Nils deals for his own right). Gazzam testified that Tjosevig told him that it was never his intention "to do anything but convey a clear title to us for the whole property," and that he would protect them against Donohoe and Smith's claim, and all other claims. Why should the grantors be willing to do this, if they really bargained and sold, and were paid for, only "our right, title, and interest," exclusive of the fractional interests which they represented that they had "advertised out"? (Gassam's deposition.)

They evidently considered that they had been successful in forfeiting the interests of all the small owners, and that they owned the entire interest, except Nils' interest.

Under the circumstances, then, it seems clear that the claims themselves were intended to pass—the entire interests, including all the interests which had been "advertised out"—and that it was in payment for all such interests as well as for the record interests that the $3,000 paid under the original option, and the $117,000 paid under the contract was paid, and that the words "all our interest" include the interest believed to have been acquired by the "advertising out," and that "remise, release, and quitclaim" conveys the land itself. Especially is this so when one considers the nature of the property, to wit, unpatented mining claims, the ultimate title to which is in the

United States, and in which *an interest is all that any one can have except the United States.*

"A conveyance of the right, title, and interest in land is certainly sufficient to pass the land itself, if the party conveying has an estate therein at the time of the conveyance." Brown v. Jackson, 3 Wheat. *452, 4 L. Ed. 432; Moelle v. Sherwood, 148 U. S. 21, 13 Sup. Ct. 426, 37 L. Ed. 350.

"Prior to the passage of the statutes made for the purpose of facilitating the manner of transferring lands, it was essential to the operation of a deed of release, that the grantee should have some estate or interest in the land released; but many of the subtle distinctions and ceremonious forms, peculiar to the ancient modes of transferring titles, are abolished, and the policy of the law now requires that we should look rather to the intention of the parties, than to the form in which it is expressed. A deed of release and quitclaim is as effectual for the purpose of transferring title to land as a deed of bargain and sale." McConnel v. Reed, 4 Scam. (Ill.) *121, 38 Am. Dec. 124.

"Such a deed is just as effectual, for the purpose of transferring real estate, as a deed of bargain and sale; and, had there been no words in the deed under consideration showing an intention on the part of the grantor not to convey the land in question, there can be no doubt that the plaintiff would have been entitled to recover. * * * The intention of the parties is the polar star by which courts are always to be guided in the construction of contracts; and can there be any question that Walker did not intend by his quitclaim deed to convey any land which he did not then own, or which might have been conveyed to any one else, when he has expressed that intention in the deed itself, as clearly as language could make it?" Butterfield v. Smith, 11 Ill. *486; Costigan on Mining Law, p. 499.

## What Interests Were Sold to the Company?

It is claimed by Tjosevig that the interests sold and for which the money was paid were not alone the $21\frac{1}{2}/48$ awarded to him by name in the decree, but also a $1/10$ joint interest of Brown and Lyons and the $2/48$ interest of Dgarf and Garwood, and also the $3/48$ interest which the decree left undisposed of; while the plaintiffs contend that Brown and Lyons never had any interest, and that, even if they did have an interest, they have not been properly advertised out, and, as to the $2/48$ and $3/48$ that Tjosevig was at the time of the contract the real owner of those interests, and that therefore they are covered by the contract.

(a) *As to Brown and Lyons:* They are not mentioned in the decree as having any interest, and I can find no specific

and direct evidence that they ever acquired a $1/10$ interest; yet Brown and Lyons appear to have been the attorneys for the brother, Nils Tjosevig, and it is possible that some interest was acquired as compensation for services rendered to him. The Tjosevigs assumed to advertise Brown and Lyons out of a $1/10$ interest in Tjosevig 1 to 15, inclusive, Norway No. 2, Nebraska, and Charlotte, and Rowe examined the forfeiture proceedings, and, according to his testimony, checked up Tjosevig's statement that he had advertised out all the smaller interests. Apparently Rowe was satisfied that Brown and Lyons did have a $1/10$ interest in said claims and that Tjosevig had advertised them out. Rowe then entered into his contract by which claims are to be deeded to him or his assigns. The money was paid on the assumption that Brown and Lyons did have a tenth interest, according to the advertisement, and that Tjosevig had acquired that interest. If Brown and Lyons did have a tenth interest, and had not been lawfully advertised out, the Tjosevigs might be accountable for selling something which they did not own, but certainly Smith and Donohoe would not have any share in what was realized for that tenth; and if Brown and Lyons did not have any interest, the fact that Tjosevig got some money for their *alleged* interest would not entitle Smith and Donohoe to a share of what he got for it. What was received on this account was for interests for which Tjosevig could not be called to account by plaintiffs, if the sum so received can be definitely ascertained and set apart from the sum received for the trust property. If the sum so received cannot be so ascertained and set apart, then it cannot be taken into consideration at all. (See this opinion, infra.)

(b) *As to the $2/48$ interest of Dgarf and Garwood:* The decree awards them this interest, but Donohoe testified that at the time of making the contract Tjosevig told him that he owned a one-half of this $2/48$ by virtue of an arrangement made at or about the time he "located Dgarf and Garwood in." Such an arrangement is not unusual among locators. If it had been made, Tjosevig's half of this $2/48$ is subject to the contract. If it had not been made, but if, notwithstanding, Tjosevig made such a statement to Donohoe, he is estopped from now claiming to the contrary. I believe from the evidence that the statement was made. Presumably, then, the other half, or $1/48$, was still owned by Dgarf and Garwood.

What has been said, then, about the Brown and Lyons interest applies with equal force to one-half of the Dgarf and Garwood $2/48$; that is to say, whether Tjosevig had or had not the right to dispose of this $1/48$, the fact remains that he did dispose of it, and that it was a component part of the property for which he received the fund which is the bone of contention here.

As to one half of this $2/48$, then, Tjosevig is accountable to Donohoe and Smith; and as to the other half he would not be accountable to them. However, what has been said above as to the ascertainability of the amount paid for the Brown and Lyons $1/10$ is applicable here.

(c) As to the $3/48$ interest left by the decree undisposed of, it appears that the owners of this interest had once been Holman, Ekemo, and Hazelet. Smith, "for the purpose of showing that at that particular time" (time of making of the contract) Tjosevig was really the owner of this $3/48$, testified that Tjosevig, in the presence of Halverson, told him that—

"he (Tjosevig) was the owner of these $3/48$—the Holman, Ekemo and Hazelet interest; that they had given this property to him, but he had neved got a conveyance from them. He also asked me, in the presence of Halverson, how he could transfer these claims to himself, to get the title where the ownership was, and I told him he couldn't convey them to himself, it would look bad on the record; that he could convey them, if he held proper powers of attorney, to some third person, and then they could convey to him, and that would complete his record, and nobody probably could question it, except those three parties; but at all times Mr. Christian Tjosevig claimed to be the owner of these $3/48$ interests, the Holman, Hazelet, and Ekemo.

"Q. And it was on that consideration that you signed the contract? A. Certainly. We were anxious to know what property he owned and claimed.

"Q. And you performed services pursuant to that understanding? A. Absolutely."

Such, also, substantially is the testimony of Donohoe. On cross-examination Tjosevig says that Holman, Ekemo, and Hazelet told him that *he* might have their interests, but he cannot recall the date when they so told him.

On the 1st of July, 1911, Tjosevig, as attorney in fact for Holman, Ekemo, and Hazelet, did convey this fractional interest to Halverson for a consideration of $1. This deed was put on record *by Christian Tjosevig* himself on July 11, 1911; and

yet on September 1, 1912, when the witness O'Connor asked him who was interested in the claims besides himself, he said he had "a *one-half interest,* and also gave the name of a man, Garwood, Gus Dgarf, Andy Holman, and his brother Nils. He said he had a *power of attorney* from both *Holman* and Garwood, which gave him a controlling interest in the property." (O'Connor's deposition.) It will be noted that he said nothing about Halverson having any interest. This is inconsistent with the idea that by the deed dated July 1, 1911, he had in good faith conveyed the Holman, Ekemo, and Hazelet interests to Halverson. O'Connor said that his recollection "is very distinct, because it was necessary in the preparation of the option to know just what the interests of each of the parties were."

The claim of ownership in Halverson of this $^3/_{48}$ interest is not made in the answer filed herein on March 13, 1917, to the original complaint. That answer was a joint answer of Tjosevig and Halverson. The claim that Halverson had any interest in this $^3/_{48}$ is not made at all until the coming in of the separate answers of Tjosevig and Halverson, which answers were made to an amended and supplemental complaint filed on the eve of the trial, on the 20th day of February, 1918, which amended and supplemental complaint had become necessary by after-acquired information as to the fund and stock, but which had made no new allegations affecting the basis of the suit.

The wording of the contract would seem to indicate that there are interests belonging to the parties of the first part which will not be involved in the decree, for the 7½ per cent. is "to be deeded from whatever remaining interest said first parties may have in all of said mining claims after the case has been decided."

If this wording does not indicate that, then it is hard to understand why the contract did not provide simply that the 7½ per cent. was to come out of what should be awarded to the parties of the first part by the decree. It would have been so easy and natural to stipulate for a "7½ per cent. interest in what was awarded."

I am satisfied from the evidence that at the time of entering into the contract Christian Tjosevig was the real owner of the Holman, Ekemo, and Hazelet interests, and that Halverson knew it. I am satisfied that the deed, signed "Andrew Holman, John Ekemo, G. C. Hazelet, by Christian Tjosevig, At-

torney in Fact for Above Names," to Andrew Halverson, was
a deed executed in pursuance of a plan to enable Christian
Tjosevig to get the legal title to the $^3/_{48}$ into himself without
the record disclosing a fact which would look bad on its face
(to wit, a conveyance from Tjosevig, attorney in fact, to Tjose-
vig); that Halverson paid no consideration; that the use of
his name was simply as a convenience, a mere subterfuge; and
that he held the legal title as trustee for Tjosevig.

As to the liability of defendants to account for the sale of
this $^3/_{48}$ interest, I hold with plaintiffs, for by the contract
Donohoe and Smith's 7½ per cent. interest is to attach to
"whatever remaining interest said first parties may have in all
of said mining claims, after [when] said case has been decided,
*  *  *  and said interest [to be] deeded shall be seven and
one-half one-hundredths of the *total interest so remaining to
said first parties,* whether each of said claims are involved in
said litigation or not," and therefore the claims and interests
concerning which the trust relation existed is that *real* interest
which existed at the time of the decree in such of those claims
as are mentioned in the contract.

### What Claims Were Sold?

At the end of the litigation, then, Mrs. Tjosevig owned the
whole interest in Dagny Marie, and Tjosevig owned $^{25½}/_{48}$ in-
terest in the other claims mentioned in the decree—being his
original $^{21½}/_{48}$ plus the $^3/_{48}$ not mentioned in the decree, plus
one-half of the $^2/_{48}$ of Dgarf and Garwood's interest.

The Dagny Marie and this $^{25½}/_{48}$, plus the $^1/_{10}$ interest of
Brown and Lyons, and plus the $^1/_{48}$ still remaining in Dgarf
and Garwood, of the claims mentioned in the contract, and plus
certain other claims not mentioned in the contract, were sold
by the plaintiffs to the Tjosevig-Kennecott Copper Mining
Company.

What were those "other claims," and how, if at all, did they
affect the amount received for the whole? Those "other
claims" were Carbonite Hill, Contact Lode, and Consolidated
Placer.

(1) *Carbonite Hill.* This claim seems to be a waif; there
is little or no testimony concerning it; it is mentioned by Sea-
graves in his deposition (page 47), where he says that what ore
he saw on the Carbonite Hill was slide rock from the Nebras-

ka. Perhaps it was a mere convenience location; evidently it is of no consequence or value, for, when Tjosevig is asked by his attorney the direct question, "What claims did you convey which are not in the contract?" he mentions only two, to wit, Contact Lode and Consolidated Placer. He is twice asked that question, and each time he makes the same reply. In the answer it is not alleged to be one of "the other claims." It is manifest that this claim did not affect the price that was paid, or was to be paid.

(2) *The Contact Lode.* Seagraves—a mining engineer of 20 years' experience, for 5 years of which time he was superintendent of the famous Kennecott mine, and who at the time of testifying was the consulting engineer of the Tjosevig-Kennecott Company, which bought the claims involved in this suit—testifies that he made a complete examination for the company, with a view of directing their operations in the development of the property, and that "I consider the Contact Lode of absolutely no value." He appears to be an eminently qualified, careful, thoughtful, and conservative witness. He was not shaken on cross-examination, and he is not interested in the result of this suit. No other witness testified as to the value of this claim, except Halverson and Tjosevig, both of whom are vitally interested. Tjosevig, in his *sworn* answer to the amended and supplemental complaint, alleges that this claim "is of great value and is worth more than all the other claims together"; but when he testified on the stand he was a little more conservative, saying only, "I consider it one of the best claims." The court thinks Seagraves is the better qualified to know, and is more worthy of belief, and finds that the Contact Lode is of absolutely no value, and did not contribute one penny to the sum total for which the claims were sold.

(3) *The Consolidated Placer.* This is eight placer claims, lying partly on the low ground and partly on the hills; the lode claims are on the mountain side. The evidence as to their value is found in the depositions of Seagraves, Hancock, and Barrett, and in the testimony of Tjosevig.

The witness Seagraves testified that the value of the Consolidated Placer depends entirely on the future development of the other claims. At present he considers it of no value, merely as a convenience; no value for its mineral contents; thinks it would not add anything to the price of the other claims. On

cross-examination he says that "if the property is developed and becomes a mine it might be useful."

F. A. Hancock, a witness for the defendants, after having shown qualifications, testified that "these associated placer claims should be a part and parcel of the quartz claims or copper claims. My contention would be that you would take the placer ground and incorporate it with the others, and allow for that part of the placer claims which it was necessary to have, an equal pro rata value to the copper claims, and this would depend altogether on the scope of your operations;" and on cross-examination, "The part which would be of value would be the level ground, a safe distance from the edge of the mountain."

J. E. Barrett, a witness for the defendants, testified that the placer claims, being on the level and suitable for millsites, terminals, etc., "would be valuable for the working of that mine," and that "the chances are if you wanted to operate the mine with the placer claims in the possession of other parties you would have to negotiate by perhaps purchase from the other parties for the terminal to work your ground," and "if you could not purchase you are kind of up against it," and he hazards an opinion that the placer claims "would have a pro rata value with the quartz claims above, but "there is no absolutely certain way of determining the relative value."

A millsite is limited by law to 5 acres of noncontiguous mineral ground, and 160 acres for terminals, bunkhouses, etc., seems excessive. The court has no doubt that some of this placer ground contributes something to the value of the quartz claims, and no doubt that without the quartz claims the placer ground is absolutely valueless; but how much of the placer ground is necessary is not clear, and how much of an addition in value that necessary part, whatever it is, makes, is "one of those things no man can find out," because according to all the witnesses the value depends upon a number of contingencies which may or may not eventuate. Nor can it be safely predicated that the trust property by being combined with nontrust property has not conferred a greater benefit on the nontrust property than the combination has conferred upon the trust property.

The trustees held the trust property in their own hands; they made this combination of trust and nontrust property;

they sold it all for a lump sum; they might have segregated it. The burden is on them to show conclusively how much they got for each kind of property, and, if they have not sustained that burden, they must bear the consequences; and those consequences are that the whole mass of the fund will be awarded to the beneficiary.

"Where a trustee so mingles the trust fund or property with his own, or so invests it in property together with his own, that the trust fund or property cannot be separated or the amount of each ascertained, the whole mixed fund or property becomes subject to the trust except so far as the trustee may be able to distinguish or separate his own fund or property, the burden of making such distinction or separation being on the trustee; and this rule applies so long as any portion of the fund or property in which the trust fund or property can be traced remains." 39 Cyc. p. 538, c, and cases cited.

I think, therefore, that the value of these placer claims (undetermined and undeterminable as it is) cannot be considered as reducing the trust fund, nor can the Contact Lode or the Carbonite Hill have any such effect; nor should any deduction be made on account of the Brown and Lyons $1/10$ or the Dgarf and Garwood $1/48$, for this reason, to wit:

If Brown and Lyons and Dgarf and Garwood had any interest at all, it was an interest in those claims only in which the advertisement purports that they have an interest, viz. Tjosevig 1 to 15, inclusive, Norway No. 2, Nebraska, and Charlotte. These interests became the individual; i. e., non-trust impressed property of Tjosevig. He, with the knowledge and consent of Eli Tjosevig and Halverson (paragraph 10, amended and supplemental complaint, undenied), combines his individual interest in some claims with trust-impressed interests in said claims, and with other claims which are his individual property, and with still other property in which he has absolutely no interest (i. e., Dagny Marie), and sells the combination for $120,000, and fails to sustain the burden of showing how much he got for each kind of property sold. 39 Cyc., supra.

The case stands, therefore, as if the price paid was paid entirely for the claims which are impressed with the trust. Donohoe and Smith are entitled to 7½ per cent. of the whole amount paid, to wit, the $3,000 which had been forfeited under the option of April 6, 1916, and $117,000 received from the

Tjosevig-Kennecott Copper Mining Company. It is not necessary, then, or pertinent, to determine whether or not plaintiffs' 7½ per cent. is to be taken out of only those claims mentioned in the contract, or is to come out of the Tjosevig *group* of claims, whatever the claims are which comprise that group.

## The Stock.

In addition to the cash received for the transfer of these claims, 125,000 shares of stock of the par value of $1 per share were to be delivered. Plaintiffs claim that this stock was worth par at one time and that it is now worth nothing; that, had Tjosevig delivered to them their share of the stock, to wit, 9,375 shares, when, as they allege, he should have done so, they could have sold it for $1 a share; and that on account of Tjosevig's delinquency in this regard they have been damaged in the sum of $9,375; and they ask the court to adjudge that amount in damages, payable out of the trust fund.

Plaintiffs are not suing to recover the *value of their share* of the trust property. They acquiesced in the sale of the property on the terms and for the price for which it was sold (paragraph 15, amended and supplemental complaint). In this suit they are entitled to recover only their proportion of what the trustee received. The sale in which they acquiesced provided that 125,000 shares of stock were to be delivered to Tjosevig June 1, 1918. The purchaser refused and still refuses to deliver the stock on account of the fact that litigation has arisen —not only this suit, but others. (Answer and reply, and Gazzam's testimony.) It does not appear that this failure to deliver was the fault of Tjosevig.

The court can therefore make no decree as to the 125,000 shares of stock, except to declare the ownership of 7½ per cent. thereof to be in Donohoe and Smith, and to enjoin Tjosevig from transferring or in any manner incumbering that amount.

## Halverson's Interest.

It will be noted that the injunction, as extended by the order of December 30, 1916, forbade the Bank of Cordova to pay out any part of the moneys then in its hands on account of the sale of these claims, or "that may have come into its hands since the date of said order, or that may come into its hands in the future * * * as part of the purchase price of said

mining claims"; and, further, that on the 13th day of March, 1917, said defendants filed their joint answer, in which no claim was made that Halverson had any separate interest in said claims, or any specific share of said funds, and that on same day they presented a motion, supported by the affidavit of Tjosevig, stating that under said injunctional orders the sum of $117,000 had been tied up, and that "it now appears that the gross sum of $12,000 is entirely adequate fully to cover the total amount which plaintiffs can recover under the pleadings herein construed in the most favorable light to the plaintiffs," and asking the court to so modify the injunction as to release to them the surplus; that thereupon the court, deeming that, under the pleadings, the sum of $17,000 was amply sufficient to cover plaintiffs' supposed claim, interest, and costs, ordered all but that amount released from the injunction, and that was done; that on the 16th day of February, 1918, the Tjosevigs and Halverson filed separate answers to the amended complaint, in which for the first time the claim is made that Halverson was the owner of the $3/4s$ interest, and that it had been agreed by said defendants that he should have $20,000 for that interest out of the money to be received ($117,000), and that he "has been paid $3,000, and the other $17,000 now tied up is his money."

Both on direct examination and cross-examination Halverson testified that this $20,000 was to be paid to him on account of the work he had done helping Chris Tjosevig and for his interest in the claims, and yet, when he is called by his attorney in redirect examination, he says, "No; it is only for his claims;" and later on, in the recross-examination, he testified, "That was supposed to be my interest in the property and what I had been doing and helping him—that is my interest in the whole thing;" and then to questions propounded by the court he said:

"I think the way I had been working in there—helping with money and helping the way I did, I thought it was worth $20,000, and I agreed with my brother-in-law and my sister I was to have that much.

"Q. How much was to be for your interest in the claims and how much for your work? A. That wasn't talked at all. * * *

"Q. What did you say to Mr. Tjosevig, when you found that he was taking the $97,000 that had been released, and leaving you with the $17,000 that had been tied up? A. Well, I will tell you:

6 A.R.—11

he was a family man, and I was single, and he had that much money, and I couldn't see how they could hold it, and I thought it was absolutely safe; that is the way I felt about it; * * * thought it was all right; I didn't know; I didn't think I would lose it; I didn't see how I could, was the only thing I could see about it."

*Tjosevig* tells Halverson that for his labors and the $3/48$ interest he is to have $1/6$ of the total amount; nearly the whole, or $5/6$, is "tied up." Tjosevig contrives to let the string slip, Halverson actually helping; so that $5/6$ is free, and he naively persuades Halverson that the part from which the string did not slip is his (Halverson's). If such an agreement was entered into it is a matter entirely between Tjosevig and Halverson; it cannot affect Donohoe and Smith's interest in the fund, or what is left of it.

It has already been held that at the time of the attorneys' contract Halverson held no interest in the claims sold. Besides, he knew, when the contract was made, that Donohoe and Smith contracted on the representation by Tjosevig that he was himself the owner of that $3/48$; he kept silent then; he is therefore estopped from claiming that interest. And, too, he joins with Tjosevig in asking that the sum tied up by the injunction be reduced to the smaller amount. The reduction was made on his and Tjosevig's representation. To allow this agreement, if any such there was, to effect Donohoe and Smith's interest, would be on a parity with allowing one who has come into possession of a sum of money derived from a sale by him of his individual property and of property held in trust (combined) to spend all of it, except enough to cover the value of the trust property, and then to say that the part spent was trust money and the part unexpended was nontrust money.

"Where a trustee who has mingled trust funds with his own afterwards takes sums from the whole common mass for his own use, it will be presumed so long as such mass is larger than the amount of the original trust funds that the sums so taken were his own and not a part of the trust funds." 39 Cyc. p. 539, d, and cases cited.

Halverson was not originally a trustee for Donohoe and Smith, as was Tjosevig, it is true; but he held the legal title to $3/48$ in trust for its real owner, Tjosevig, and, as he knew that Tjosevig had contracted to give Donohoe and Smith $7\frac{1}{2}$ per cent. thereof, he is in no position to claim that $17,000 for him-

self, especially after joining with the Tjosevigs in the application to reduce the amount held under the injunction, and agreeing with Tjosevig, as he says he did agree.

But, while I am satisfied that Halverson did not own that $^3/_{48}$, and is estopped from claiming it, so far as the rights and equities between him and Donohoe and Smith are concerned, yet he filed his separate answer, claiming it, and according to the pleadings of Tjosevig (answer to amended complaint) and the testimony of Tjosevig he is certainly entitled to it as against the Tjosevigs. Tjosevig seems willing that he should have it.

I think, therefore, that all that portion of the fund in excess of the amount awarded to Donohoe and Smith, interest and costs, should be turned over to Andrew Halverson.

The Cordova Bank will be ordered to deposit the sum ($17,000 and whatever interest it has earned) in the registry of the court, to be disposed of as indicated.

Let findings and decree in accord herewith be submitted for signature.

⬦See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes